**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
----------------------------------------------------------------X

ELIANA RICARDO MONCADA and MARIYA
DUKLER, on behalf of themselves and all others
similarly situated,

                        Plaintiffs,

     v.

NUNA BABY ESSENTIALS, INC.

                   Defendant.

----------------------------------------------------------------X

Civil Action No: _____

**<u>CLASS ACTION COMPLAINT</u>**

Plaintiffs Eliana Ricardo Moncada and Mariya Dukler, on behalf of themselves and all

others similarly situated ("Plaintiffs"), by and through their undersigned counsel, Denlea &

Carton LLP, state as and for their Complaint against defendant Nuna Baby Essentials, Inc.

("Nuna" or "Defendant"), as follows:

<u>**NATURE OF THE ACTION**</u>

1.      The decision as to which car seat to purchase is among the first and most

important choices new parents will make.  Reasonable consumers expect that, when they

purchase a child restraint system ("CRS") designed for infants, toddlers and preschoolers, it will

keep their babies safe.[1] A convertible car seat is a type of CRS that promises safety, security and

the ability to grow with children as they move from rear facing infants to forward-facing

---

[1] American Academy of Pediatrics. *Car Seats: Information for Families*.  HealthyChildren.org
(Feb. 26, 2024), https://www.healthychildren.org/English/safety-prevention/on-the-
go/Pages/Car-Safety-Seats-Information-for-Families.aspx (last accessed March 7, 2025).

preschoolers.[2]  All convertible seats have a five-point harness system "to keep the baby safe, secure and comfortable when traveling in the vehicle."[3]

2.      Defendant designs, manufactures and sells defective convertible car seats that do not deliver on their promise of safety and high-quality (collectively, the "Products" or the "Car Seats.")  Rather, all Nuna Rava convertible car seats manufactured between July 16, 2016 and October 25, 2023, contain defective front harness adjusters that may allow the harness to loosen.[4] The consequences of a loose harness can be dire: as the user manual cautions,"[i] your child is not properly secured in the Child Restraint, they may be ejected in a crash, resulting in serious injury or death."[5]

3.      On its website, Defendant advertises the Nuna Rava convertible seat as a "Fan-favorite for security, longevity and sleek design" and as "an uncomplicated convertible car seat that becomes a reliable anchor to your child's car-riding adventures and your parental peace of

---

[2] The Nuna Rava can be used in rear-facing mode for children who range from 5 to 50 pounds and are 49 inches or less in height, and in forward-facing mode for children who weigh 30 to 65 pounds and are 49 inches or less in height.

[3]  Heather Corley, *Infant Car Seats vs. Convertible Car Seats,* Parents (August 7, 2024), https://www.parents.com/infant-car-seats-choosing-the-best-car-seat-8643837 (last accessed March 7, 2025).

[4]  The impacted models and colors/designs include CS-50-001 (Caviar), CS-50-002 (Indigo), CS-50-003 (Berry), CS-50-004 (blackberry), CS-50-005 (slate), CS05101CHC (Charcoal), CS05101HCV (verona), CS05103CVR (caviar), CS05103FRT (frost), CS05103GRN (granite), CS05105LAK (Lake), CS05103OXF (oxford), CS05103ROS (Rose), CS05115DDC (Droplet Dot Collection), CS05105BAC (Broken Arrow Caviar), CS05106BRS (Brushstroke), CS05107RFD (refined), CS109RVT (riveted), CS05110LGN (Lagoon), CS05110EDG (Edgehill), CS05110OCN (Ocean), CS05114CRD (Curated), and CS05104THR (Threaded).

[5] *See* Nuna, *Rava User Manual*, pages 58-59, https://nunababy.com/media/catalog/product/N/u/Nuna_RAVA_UserManual_US_91c9.pdf. It is for this reason that the American Academy of Pediatrics advises parents or caregivers to ensure that the harness is snug, and that the chest clip sits at the center of the chest.  *See* American Academy of Pediatrics. *Car Seats: Information for Families*.  HealthyChildren.org (Feb. 26, 2024), https://www.healthychildren.org/English/safety-prevention/on-the-go/Pages/Car-Safety-Seats-Information-for-Families.aspx (last accessed March 7, 2025).

mind."[6]  It promises a "[q]uick-release 3 to 5-point harness" that "makes it easy to fasten [children] in."[7]  Elsewhere, Defendant invokes its roots in the "ingenuity of Dutch design," and assures parents and caregivers that "Craftsmanship, clean lines, and thoughtful solutions are put at the forefront of each product," and that it "never compromise[s]" safety.[8]

4.      Defendant makes these representations because it knows that parents and caregivers are willing to pay more for high-quality and safe baby products.  No reasonable consumer would purchase a more expensive car seat to transport an infant or young child that has a safety defect that could result in serious injury to their child.

5.      Unfortunately, the harness adjuster cover on the Rava seat is designed in such a way that debris such as crumbs or dust can enter the area where the front harness adjuster button is located.[9]  Debris prevents the teeth of the adjuster mechanism from properly clamping on the adjuster strap, allowing the harness to loosen and creating a hazard to the seat's occupant (the "Defect").  This Defect prevents the seat from performing its basic function as a child restraint system: to secure the child in the seat.

6.      The Defect is confirmed by Nuna's voluntary recall of the Products on December 19, 2024 (the "Recall").  A copy of the Recall notice is attached as Exhibit A.[10]  The Recall affects more than 600,000 RAVA convertible car seats.

---

[6]  https://nunababy.com/usa/rava-convertible-car-seat?color_ref=16391 (last accessed March 12, 2025).

[7]  https://nunababy.com/usa/rava-convertible-car-seat?color_ref=16391 (last accessed March 12, 2025).

[8] https://nunababy.com/usa/about (last accessed March 12, 2025).

[9]  https://nunababy.com/recalls-rava1 (last accessed March 12, 2025).

[10] Exhibit A was downloaded from https://nunababy.com/usa/recalls-rava1 (last accessed March 10, 2025).

7.      As part of the Recall, Defendant created a "Remedy Kit" which it is sending to owners of RAVA car seats manufactured before October 25, 2023, who happen to learn of the Recall directly because they registered their Product or indirectly through other channels <u>and</u> who fill out a form on the website to request it.  Because Defendant only intends to send the Remedy Kit to those consumers who request it by providing their name, address, model and serial number, it is unclear whether a majority of the Product purchasers will ever learn about the Recall or receive a "Remedy Kit."

8.      In the Recall notice, Defendant acknowledges that debris in the harness adjuster may cause the harness to loosen, and instructs parents and caregivers to check the harness before each use by pushing on the back of the seat while simultaneously pulling forward firmly on the harness straps.  The Recall notice states that "You may continue to use your car seat as directed if your car seat's harness is functioning properly and securing the occupant consistent with the existing instruction manual and labels.  **If your car seat's harness is not functioning properly, stop using your RAVA car seat and contact Nuna immediately**" (Ex. A).

9.      The following illustrations of the location and nature of the Defect are shown on the Nuna Recall notice (Ex. A):



10.     The remedy Defendant offers consumers who receive notice of the Recall is
entirely inadequate.  Defendant is not recalling the Product; rather it will send a "seat pad, head
support cover and cleaning kit" to those consumers who request it.  While awaiting their remedy
kits, consumers are advised that they can continue to use their car seats if the harness "is
functioning properly and securing the occupant consistent with the existing instruction manual
and labels."

11.     The whole Recall process is fatally flawed because: i) it is not designed to reach
the majority of consumers who purchased the Product; ii) it requires consumers to perform a
logistically complicated "Harness Function Test" of the seat prior to every use before the
"Remedy Kit" arrives and to have a back-up seat to use at a moment's notice if the harness fails
the test; iii) the so-called remedy requires consumers to perform an onerous, impracticable, time
consuming, and complex multi-step repair process; iv) it requires consumers to install the repair

themselves, as laypersons, with no knowledge of the design of car seats; v) it does not include a Recall of the entire Product (only the harness adjuster cover and seat covers which parents and caregivers must replace themselves); and vi) it provides consumers with no monetary remedy whatsoever or opportunity to obtain replacement of the car seat even though they purchased a dangerous and defective Product for a premium price and even though they must purchase or find a "back up" car seat to have on hand until such time as the Defect is repaired.

12.    Defendant impliedly warrants that the car seats are fit for the ordinary purpose for which they are sold: a safe, defect-free child restraint system.

13.    Plaintiffs and other class members have been forced to continue using a Product that Defendant admits is unsafe and defective, to undertake a safety assessment and repair of the car seat on their own; and discontinue use immediately if they subjectively determine that the harness is not functioning properly until such time as a repair can be made. Plaintiffs and other Class Members may also be forced to purchase another CRS so that they have an alternative on hand if they notice a loose harness or determine that the Defect is not remedied by the co-called repair, thereby incurring further damages from Defendant's misconduct.

14.    Plaintiffs and Class Members relied on Defendant's misrepresentations and omissions that the Products were high-quality, safe, defect-free and fit for their intended use, and would allow their children to be safely transported in their vehicles from the time of purchase until their children outgrew them.

15.    Consequently, Plaintiffs and Class Members lost the entire benefit of their bargain when what they received were car seats that are not high-quality and not safe to transport their children.

16.     Alternatively, Plaintiffs and Class Members paid a price premium for the Product based upon Defendant's marketing and advertising campaign.  Given that Plaintiffs and Class Members paid a premium for the Products, Plaintiffs and Class Members suffered an injury in the amount of the premium paid.

17.     Accordingly, Defendant's conduct violated and continues to violate, *inter alia*, New York General Business Law §§ 349 and 350, and constitutes a breach of express and implied warranties.

18.     Plaintiffs bring this action against Defendant on behalf of themselves and Class Members who purchased the Products during the applicable statute of limitations period (the "Class Period").

## THE PARTIES

19.     Plaintiff Eliana Ricardo Moncada is an individual who resides in Bronx, New York.

20.     Plaintiff Mariya Dukler is an individual who resides in Staten Island, New York.

21.     Defendant Nuna Baby Essentials, Inc. is a Pennsylvania corporation with its principal place of business in Pennsylvania.

22.     Defendant Nuna Baby Essentials, Inc. designs, manufactures, markets, and sells juvenile products, including the Products at issue, in the United States and New York, both online and through brick and mortar stores such as Bloomingdales, Nordstrom, Pottery Barn Kids, and Dillard's.

## JURISDICTION AND VENUE

23.    This Court has subject matter jurisdiction over this action pursuant to the Class Action Fairness Act of 2005, 28 U.S.C. § 1332(d), because (1) the amount in controversy exceeds the sum or value of $5,000,000.00, exclusive of interest and costs, and (2) the named Plaintiff and Defendant are citizens of different states.  28 U.S.C. § 1332(d)(2)(A).

24.    The Court also has jurisdiction over this action pursuant to 28 U.S.C. § 1332(a), as the parties are diverse and the amount in controversy exceeds the requisite threshold.

25.    This Court may exercise jurisdiction over the Defendant because it has sufficient minimum contacts in New York and purposely avails itself of the markets within New York through the promotion, sale, marketing, and distribution of its products, thus rendering jurisdiction by this Court proper and necessary.

26.    Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events giving rise to the claim occurred within this judicial district and because Defendant has marketed and sold the products at issue in this action within this judicial district and have done business within this judicial district.

## CHOICE OF LAW

27.    New York law governs the state laws claim asserted herein by Plaintiffs and the New York class they seek to represent.

28.    New York has a substantial interest in protecting the rights and interests of New York residents against wrongdoing by companies that market and distribute their products within the State of New York.

## FACTUAL BACKGROUND

I.    **Nuna Markets Itself as Offering Premium Baby With a
Focus on High-Quality and Safety**

29.    Nuna markets itself as offering "premium baby gear" offering "high performance" and "timeless" style "expertly engineered for the modern life."[11]  Nuna reassures new parents that "Having been in [your] shoes, we've planned every little detail of our premium gear to fit your needs. Enjoy each step, snuggle, and sway along the way with confidence, knowing we've designed around your life."[12]  A video posted by Nuna car seat "expert," Bob Wall, on the website touts that, in his opinion, "the best thing about Nuna is you keep it simple and safe."[13] Nuna represents that "[o]ur baby gear is extensively tested before it leaves the factory. We use advanced equipment and testing methods, going above and beyond what's required. To ensure compliance with safety standards, we regularly have our gear tested at accredited, independent labs."[14]

30.    The Rava CRS, like other Nuna products, is represented on the website to be a "reliable anchor to your child's car-riding adventures and your parental peace of mind."  Nuna advertises that the Rava features a "[n]o-rethread harness [that] makes it easy to adjust for comfort and growth."[15] Under "Features and Specs," potential purchasers are told that the Rava offers a "quick-release 3 to 5-point harness that makes it easy to fasten them in."[16]

---

[11] https://nunababy.com/usa/about (last accessed March 12, 2025).

[12] https://nunababy.com/usa/about (last accessed March 12, 2025)

[13] https://www.youtube.com/embed/vum-CTMuKw4 (last accessed March 12, 2025).

[14]  *Id.*

[15] https://nunababy.com/usa/rava-convertible-car-seat?color_ref=16853 (last accessed March 12, 2025).

[16] https://nunababy.com/usa/rava-convertible-car-seat?color_ref=16853 (last accessed March 12, 2025).

31.     These representations about quality and safety are materially important to Plaintiffs, like all reasonable consumers, because child restraint systems, such as the Products at issue, are essential to protect infants, toddlers and young children, especially in the event of a crash.

32.     With these representations, the Rava seat product line commands a premium price, currently retailing for between $450 and $550.

33.     The instruction manual that comes with the Rava car seats contains many warnings and admonitions for its proper use.  Among others are: "Do not attempt to disassemble the child restraint. Only perform steps shown in this manual" and "The child restraint harness system cannot be removed. DO NOT attempt to remove the harness system."[17]

## II.    The Product Contains a Dangerous Defect

34.     On December 19, 2024, Defendant initiated a voluntary recall of Rava car seats manufactured between July 16, 2016 and October 25, 2023.  The Recall notice states that debris entering the area where the front harness adjuster button is located "may cause the teeth of the adjuster mechanism to no longer properly clamp onto the adjuster strap, resulting in the harness no longer remaining tight. A loose harness may not properly restrain the occupant, increasing the risk of injury in a crash." (Ex. A).

35.     Any reasonable parent would know that such "debris" could include particles of food (from children snacking in their seats), as well as sand, dust and dirt from children's shoes

---

[17] *Id.* at pages 62, 68.  This caution is repeated on Nuna's You Tube cleaning tutorial for the Rava car seat, which states that "It's important to note that the harnesses on seats with no re-thread harnesses should never be removed during the cleaning process." https://www.youtube.com/watch?v=r8u6_rfliDE (posted September 8, 2020) (linked at https://usasupport.nunababy.com/hc/en-us/articles/360049585791-RAVA-Convertible-Car-Seat-FAQ) (last accessed on March 12, 2025).

and clothing, and detritus from art projects, games and myriad other child-generated sources (including inevitable messes resulting from motion sickness and potty accidents) that gets trapped in the fabric and pushed into the crevice.  Nuna acknowledges this basic fact of life in its introductory comments to its instruction video for cleaning the car seat cover posted on You Tube: "From crumb filled messes to major blow outs, we all know things can get a little messy!"[18]

36.    The Recall notice directs parents and caregivers who purchased the defective seats to check the harness by performing a "Harness Function Test," to discontinue use and contact Nuna if the harness is not functioning properly, and to request a "Remedy Kit" to repair their car seats.  (Ex. A).  The Harness Function Test goes beyond the normal "pinch" test parents are encouraged to perform routinely to make sure the harness is secure:[19] it requires two hands to perform and must be completed when the seat is empty because one hand pushes on the back of the seat while the other hand pulls forward firmly on all the harness straps.

37.    A seven and a half minute video embedded on the website provides a visual aid to installing the "Remedy Kit," and written instructions are downloadable from the website.  The written instructions contain the warning that parents and caregivers must "Carefully read and understand all instructions and warnings in this manual, the manual that comes with child restraint, and those labeled on your child restraint. Failure to do so can result in the SERIOUS

---

[18] https://www.youtube.com/watch?v=r8u6_rfliDE (posted September 8, 2020) (linked at https://usasupport.nunababy.com/hc/en-us/articles/360049585791-RAVA-Convertible-Car-Seat-FAQ) (last accessed on March 12, 2025).  User comments indicate that many consumers find the process of removing and reinstalling the covers alone to be very complicated.

[19] Under normal conditions, Nuna instructs that "[t]o determine if the harnesses are tight enough, the caregiver should use the "pinch" test. If you can pinch the harness vertically between your fingers at the shoulders, then tighten till you cannot pinch any of the harness between your fingers." See https://usasupport.nunababy.com/hc/en-us/articles/360049585791-RAVA-Convertible-Car-Seat-FAQ (last access March 12, 2025).

INJURY or DEATH of your child." It also cautions parents to "Perform the steps in this document, carefully and completely, and always follow the owners [sic] manual for use and installation. Keep screwdriver and brush away from child. Tools are not intended to be toys. Keep screwdriver, brush and instructions for future use."

38.    Both the video and the written instructions confirm how difficult the "Remedy Kit" (which comes with a seat pad, head support cover, screw driver and cleaning brush) is to tackle: Step 1 ("Remove Seat Pad and Head Support Cover") contains six sub-steps and multiple sub-sub-steps.  Step 2 instructs the parents or caregiver to perform the Harness Function Test. Those car seats that fail the test must proceed to Step 3 (Clean Harness Adjuster), another multi-step process where parents must flip the seat over, find and remove the harness adjuster screws with the screwdriver, pull the harness adjuster cover off the seat and slide it along the webbing (without removing it from the webbing), then clean it with the cleaning brush (another multistep process), before reversing sub-steps 1-5 "to reassemble the harness cover."

39.    Even after completing all these sub-steps, parents are still not yet done with Step 3.  After performing another Harness Function Test, they are instructed to reinstall the harness adjuster cover. "To reinstall, after test, slide harness adjuster cover back into place (5) and reinstall screws to secure harness adjuster cover (3) (do not overtighten), work harness back and forth through adjuster and perform Harness Function Test again to confirm proper installation." Then parents can move on to Step 4 (Attach New Seat Pad and Head Support Cover), which itself has ten additional sub-steps.  Finally, to complete the process, parents must re-do Step 2 Harness Function Test.

40.    Upon information and belief, even after all these steps are performed as correctly as reasonably possible, the car seat harness still does not function correctly because the adjuster

button is no longer easily accessible, and the new seat pad and head support cover do not fit on the car seat properly.

41. The Products thus fail their core mission as child restraint systems. The Defect renders the Products unsafe and unsuitable for their intended purpose, and increases the risk of injury to children in the event of a crash or if the harness loosens at any time. A loose harness may cause a children to slide into an improper position in the seat or even asphyxiate.[20]

42. Even the Harness Function Test (which must be completed each time the car seat is used until the Defect is fully fixed and three times while installing the so-called "Remedy") is impracticable under most conditions: a parent cannot complete it while holding an infant or toddler and it is unclear what Nuna expects parents to do with their children while they are performing the test which requires the seat to be empty.[21]

43. Defendant claims to have corrected the Defect with a design change for Rava car seats manufactured after October 25, 2023, that replaced the plastic cover on the car seats' harness adjuster with a fabric cover. (Ex. A).

### III. Defendant's Recall of the Products and the Remedy Offered Under the Warranty are Wholly Inadequate

44. Defendant only began contacting registered owners about the Recall as of January 15, 2025. Although the Recall notice remains posted on the Nuna website and news of the Recall has spread on social media, notice is clearly not designed to reach the majority of consumers who purchased or use the Product.

---

[20] *See, e,g,* The Car Seat Lady*, How to Buckle Up*, https://thecarseatlady.com/buckling-up-rfo-seat/ (last accessed March 7, 2025) (noting that between 2004 and 2008, "31 babies died in their car seats due to asphyxiation or strangulation" when harnesses were not fastened securely).

[21] As any reasonable parent or caregiver would know that, depending on the age of the child, he or she would have to be secured in a stroller, playpen or other car seat while the test is being performed, or another parent or caregiver would have to be present to watch the child.

45.     The remedy Defendant offers consumers who receive notice of the Recall is entirely inadequate.  Rather than actually recalling the Product, Defendant will provide affected owners who request it with a free "Remedy Kit."  As noted above, the so-called "Remedy Kit," which only became available in mid-February, involves a complicated multi-step process during which parents and guardians are asked to disassemble and reassemble the car seat expressly contrary to the instruction manual.  Even if the instructions are followed as reasonably correctly as possible, the so-called repair creates new problems with the harness and car seat cover, and, as Nuna acknowledges to the NHTSA, it will only "***help*** prevent debris from entering the harness adjuster mechanism"[22] (emphasis added).

46.     If parents or caregivers do not feel comfortable performing the Step 2 "cleaning" (which actually requires disassembling and reassembling an essential component of the car seat) on their own, they are instructed to ship the seat back to Nuna to perform the "cleaning" correctly.  During such time, parents and caregivers must purchase or acquire a new car seat so that they can safely transport their children in their vehicles.

47.     The Recall thus puts the burden on already over-burdened parents and caregivers to repair a critical component of the five-point harness system, the entire purpose of which is to keep their children safe and secure.  Parents and caregivers are laypeople without any special training or knowledge of care seat design which is why the instruction manual contains the instruction "Do not attempt to disassemble the child restraint. Only perform steps shown in this manual." Defendant shirks its responsibility to provide consumers with a safe and functioning

---

[22] Part 573 Safety Recall Report Update Dated February 25, 2025, available at https://static.nhtsa.gov/odi/rcl/2024/RCLRPT-24C002-3238.PDF (last accessed March 12, 2025).

harness system by shifting this burden to them and by asking them to perform steps not in the instruction manual.

48.     Finally, the Recall is inadequate because it provides consumers with no monetary remedy whatsoever or opportunity to obtain replacement of the car seat even though they purchased a dangerous and defective Product for a premium price, even though they are being asked to perform an onerous and unreasonable repair on their own that may not even work or may create new problems with the car seat, and even though many parents and caregivers will have to purchase backup car seats so that they have a replacement on hand if they notice that their car seats fail the "Harness Function Test" before or after receiving a so-called "Remedy Kit."

49.     Consumer anger, unhappiness and frustration with the Recall is rife on Reddit with posters in subreddits for "workingmoms,"[23] "moderatelygranolamoms,"[24] "beyondthebump,"[25] "daddit"[26] and "parenting"[27] complaining about the faulty design, non-working harnesses, inadequate notice of the Recall, inept and inadequate response from Nuna, and difficulty of following the so-called instructions to "fix" the Defect.  The following posts sum up many of the issues consumers are experiencing:

---

[23] https://www.reddit.com/r/workingmoms/comments/1j2v3lu/nuna_rava_recall/ (last accessed March 12, 2025).

[24] https://www.reddit.com/r/moderatelygranolamoms/comments/1hi82cv/nuna_rava_recall/ (last accessed March 12, 2025).

[25] See https://www.reddit.com/r/beyondthebump/comments/1hi0tnv/nuna_rava_recall/ (last accessed March 12, 2025).

[26] https://www.reddit.com/r/daddit/comments/1hnpuad/nuna_has_issued_a_voluntary_recall_of_more_than/ (last accessed March 12, 2025).

[27] https://www.reddit.com/r/Parenting/comments/1j3ieal/anyone_else_having_major_problems_with_how_nuna/ (last accessed March 12, 2025).



**Intelligent-Dare-864** · 3mo ago

Ok so I just did the test, and it looks like I have a car seat that the straps do in fact move! Yikes! Obviously going to discontinue use immediately, but what am I supposed to do now about not having a car seat? Am I supposed to just purchase a new one? Hard to find answers! Stressed to say the least!

⬆ 15 ⬇   ◯ Reply   Award   ↗ Share   ···



**alollytime13** · 5d ago

How do they expect me to perform a function test EVERY TIME before buckling my toddler in? Do I just set him down in a parking lot and let him while I buckle and tighten the straps all the way so I can pull them? This is absurd.

⬆ 1 ⬇   ◯ Reply   Award   ↗ Share   ···

**Pa-rticular1** · 3d ago

I also noticed that they were selling the new design long before they released this voluntary recall, and I agree it is shady. And I think it's lame they are only offering the cover in caviar- I specifically bought a lighter color because I live in a place that is very hot and did not want a black car seat for that reason.

Additionally, the new seat cover design is getting poor reviews. Many of the reviews of the new design say that the cover over the harness release button is making it very difficult to get your finger in there to use the button when the seat is installed in the vehicle.

Finally, if you watch the video, in order to ensure your recalled seat is safe, you have to disassemble and reassemble part of your car seat with a screwdriver to clean the problematic area. This is not something I think consumers should be doing with their car seats.

Because of the difficulty accessing the button, I purchased a Britax poplar instead for my second child. I can't say the harness release is very easy on the Britax either actually, but it's not bad. So far I am very happy with it.

⬆ 1 ⬇   ◯ Reply   Award   ↗ Share   ···

16



⬆ 3 ⬇     ○ Reply     ⛭ Award     ↗ Share     ⋯

**Aromatic-Turnip9887** · 1mo ago

I feel exactly the same way as you. I am highly annoyed by the customer service they are providing and how they are handling this recall. Nuna knew about this recall. They should have had the replacement pieces ready to go and overnight them to their customers. When you're dealing with the safety of children, you cannot be lackluster and laid back on a recall. I would expect them to be going above and beyond to ensure all children remain safe in their Nuna Rava car seat.

When I spoke with them today, I asked them what I should do about the car seat because the harness straps do not remain locked. They told me to stop using it immediately. However, they did not provide any help or suggestions as to what we should do without a car seat. They said "you could buy one for $60 at Wal Mart". I was completely appalled at this advice.

I really hope a class action lawsuit will be brought to them regarding how they are handling/ or lack of handling this recall.

I would never buy nor recommend a Nuna car seat ever again.

⬆ 3 ⬇     ○ Reply     ⛭ Award     ↗ Share     ⋯

50.     Defendant's false and misleading marketing of these dangerous Products, and its knowing failure to disclose the grave risks of allowing children to continue to use these Products, allowed Defendant to reap profits at the expense of ordinary consumers who paid for premium high-quality and safe child restraint systems and believed their infants, toddlers and preschoolers would be safe in Defendant's Products.

51.     Every Product suffers from the uniform Defect which, unknown to consumers, but known to Defendant, exists at the point of purchase and poses an unreasonable safety hazard to children.

52.     Defendant's misrepresentations and omissions were material and intentional because parents and caregivers are concerned about their children's safety and reasonably expect that a product designed and marketed as a high-quality child restraint system for children will keep their children safe and will be defect-free.  Consumers such as Plaintiffs and the Class Members are influenced by the marketing and advertising campaigns for the Product.

53.     Defendant's deceptive representations and omissions are material in that a reasonable person would attach importance to such information and would be induced to act upon such information in making purchase decisions.

54.     Defendant's false, misleading, and deceptive misrepresentations and omissions are likely to continue to deceive and mislead reasonable consumers and the general public, as they have already deceived and misled Plaintiffs and the Class Members.

55.     In making the false, misleading, and deceptive representations and omissions described herein, Defendant knew and intended that consumers would pay a premium for a Product marketed as being a high quality and safe child restraint system.

56.     Consumers such as Plaintiffs and Class Members purchased and continued to purchase the Product in part because the Product is advertised as a high quality and safe product. Plaintiffs and Class Members would have paid less for the Product, or they would not have purchased them at all, but for the misrepresentation that the Product is high-quality, safe, defect-free and fit for its intended use. Therefore, Plaintiffs and Class Members have suffered a financial injury in the form of paying a price premium that the Product commands in the market as a result of Defendant's representation that the Product is high-quality, safe, defect-free, and fit for its intended use.

57.     In addition, Defendant breached the product warranty when it shipped the Rava car seats at issue (and at the point of sale to consumers) because the car seats were defective when they came off of the assembly line. The Defect makes consumers unable to use the car seats properly or safely.

IV.    **Plaintiffs Purchased the Product Relying on Defendant's Representations that the Product was High-Quality and Safe**

**Eliana Ricardo Moncada**

58.    In July 2023, Ms. Ricardo Moncada purchased a Nuna Rava car seat online from Nordstrom for $399.99, after her son outgrew his rear-facing infant car seat.

59.    Prior to purchasing the Nuna Rava car seat, Ms. Ricardo Moncada conducted significant research into various car seat brands, including Nuna.  As part of her research, Ms. Ricardo Moncada visited the Nuna website where she read safety and other product information.

60.    Through this process, Ms. Ricardo Moncada read and relied on Defendant's advertising and marketing materials, including its representation that the Product was known for its safety and high quality.

61.    Although the car seat initially performed as expected, more recently Ms. Ricardo Moncada has experienced challenges adjusting the car seat's harness, which often sticks in position.

62.    Ms. Ricardo Moncada was not aware that the Product contained a Defect, or aware of Defendant's misrepresentations that the Product was safe, defect-free, and fit for its intended use, until Defendant sent her a notice dated February 21, 2025, that her car seat was affected by the Recall and advising her that she should register online to receive her remedy kit.

63.    Because the harness of her car seat is not functioning properly and her seat was still under the two year warranty, Ms. Ricardo Moncada contacted Nuna to find out if they would offer her an alternative remedy.

64.    Nuna advised Ms. Ricardo Moncada that it "understood her concerns," but advised her that "[a]t this time, we are not offering replacements or refunds for the car seats." The response further stated that she could "rest assured" that if the harness was functioning

properly "you may continue to use your car seat as directed." If the harness was not functioning properly, she was told to "stop using the seat until you receive your kit."

65.    Had Ms. Ricardo Moncada understood the true nature of the Product at the time of purchase, or had Ms. Ricardo Moncada known about the truth about Defendant's misleading representations, or had Ms. Ricardo Moncada known that Defendant would expect her to repair a Defect in the car seat on her own, she never would have purchased the Product, or would have paid substantially less for it.

66.    The only appropriate remedy for Ms. Ricardo Moncada is a full refund for the Product.

**Mariya Dukler**

67.    In November 2021, Ms. Dukler, who at that time had one child, purchased a black Nuna Rava car seat online from Bloomingdales for $499.95. Her toddler had recently "graduated" from a rear facing infant seat to a 2018 Nuna Rava convertible seat given to her by a family member, and Ms. Dukler needed a second car seat for her family's other vehicle.

68.    Prior to purchasing the Nuna Rava car seat, Ms. Dukler asked for recommendations from friends, investigated car seat complaints and recalls on the NHTSA website, and went on Nuna's website and those of other car seat manufacturers to research product quality and safety among other factors.

69.    Through this process, Ms. Dukler read and relied on Defendant's advertising and marketing materials, including its representations that the Product was known for its safety and high quality.

70.    In March 2022, Bloomingdales notified Ms. Dukler that she needed to replace the Nuna Rava car seat she purchased in November 2021. Ms. Dukler returned the car seat she had

originally purchased, and she was sent a replacement Nuna Rava car seat (serial number CS05103CVR).  Ms. Dukler, who now has a second child, still uses the car seat every time she drives with her child.

71.     Ms. Dukler was not aware that the Product contained a Defect, or aware of Defendant's misrepresentations that the Product was safe, defect-free, and fit for its intended use, until after Defendant published its Recall notice.  Even then, she did not receive any formal notice, but only happened to learn about it from social media.

72.     After Ms. Dukler learned about the Recall, she tested the harness on her 2021 Rava car seat and discovered that it loosened when she applied pressure. Ms. Dukler immediately discontinued use of the car seat and ordered a Remedy Kit.  When the kit finally arrived three weeks later, Ms. Dukler did her best to follow the instructions, to clean the harness adjuster mechanism (although she did not see any visible debris in the teeth), and to install the new seat pad and head support cover.  The entire process was time-consuming and confusing.

73.     Had Ms. Dukler understood the true nature of the Product at the time of purchase, or had Ms. Dukler known about the truth about Defendant's misleading representations, or had Ms. Dukler known that Defendant would expect her to repair a Defect in the car seat on her own, she never would have purchased the Product, or would have paid substantially less for it.

74.     The remedy offered to Ms. Dukler through the Recall following a three week period when she was deprived completely of the car seat's use - that is, finally sending a "Remedy Kit" – is entirely inadequate.  After doing her best to follow instructions, Ms. Dukler is not happy with her car seat.  The new cover (which seems wider and longer than the car seat cover that came with her model) does not fit correctly on the seat and pushes her child forward into an awkward position.  In addition, the harness adjuster button is now completely obstructed

by a tight fabric panel, so the harness cannot be adjusted properly or easily.  Next, Ms. Dukler is

not confident that she performed the repair correctly and now has to check the harness every time

she uses it to make sure that the teeth are gripping properly. Finally, the availability of the repair

kit does not remedy the false misrepresentations and omissions Defendant has made regarding

the Product and does not make Ms. Dukler whole.

75.     In addition, it is neither reasonable nor practicable for Ms. Dukler to continue

checking her car seat harness before each use to ascertain whether the teeth of the harness

adjuster are properly gripping the harness until such time as her child outgrows the seat and to

have to take the seat apart to adjust the tightness of the harness because she cannot access the

harness adjuster button.

76.     The only appropriate remedy for Ms. Dukler is a full refund for the Product.

## CLASS DEFINITION AND ALLEGATIONS

77.     Plaintiffs brings this action on behalf of themselves and all other similarly situated

consumers in the State of New York pursuant to CPLR Section 901, and seeks certification of

the following class (the "Class"):

> All consumers who, within the applicable statute of limitations
> period, purchased a Rava convertible car seat, in the State of New
> York (whether online or in-person) manufactured, marketed,
> distributed, and/or sold by Defendant between July 16, 2016, to
> October 25, 2023, and which Defendant warranted as being high-
> quality, safe, defect-free, and fit for their intended use as child
> restraint system (the "Class Products").  Excluded from the class are
> Defendant, its parents, subsidiaries, affiliates, officers and directors,
> judicial officers, and their immediate family members and
> associated court staff assigned to this case, and those who purchased
> Class Product for resale.

78.     Plaintiffs expressly disclaim any intent to seek any recovery in this action for

personal injuries that they or any Class member may have suffered.

79.    **Numerosity**.  This action is appropriately suited for a class action.  The members

of the Class are so numerous that joinder of all members of the Class is impracticable.  Plaintiffs

are informed, believe, and thereon allege, that the proposed Class contains thousands of purchasers

of the Class Products who have been damaged by Defendant's conduct as alleged herein.  The

precise number of Class members is unknown to Plaintiffs.

80.    **Existence and Predominance of Common Questions of Law and Fact**.  This

action involves questions of law and fact common to the Class.  The common legal and factual

questions include, but are not limited to, the following:

- Whether Defendant's conduct, as alleged herein, constitutes violations of New York General Business Law Section 349**.**

- Whether Defendant's conduct, as alleged herein, constitutes violations of New York General Business Law Section 350.

- Whether Defendant labeled, packaged, advertised, marketed, and/or sold the Class Products with claims that they were high-quality, safe, defect-free, and fit for their intended use as child restraint system;

- Whether Defendant's labeling, packaging, advertising, marketing, and/or selling of the Class Products with claims that they were high-quality, safe, defect-free, and fit for their intended use as child restraint system and/or is false, fraudulent, deceptive, and/or misleading;

- Whether Defendant's manufacturing, distributing and selling of the Class Products breached its express or implied warranties.

81.    **Typicality**.  Plaintiffs' claims are typical of the claims of the members of the

Class because, *inter alia*, all Class members have been injured through the uniform misconduct

described above and were subject to Defendant's misrepresentations.  Moreover, Plaintiffs'

claims are typical of the Class members' claims.  Plaintiffs are advancing the same claims and

legal theories on behalf of themselves and all members of the Class.

82.    **Adequacy of Representation**.  Plaintiffs will fairly and adequately protect the

interests of the members of the Class.  Plaintiffs purchased a Class Product, and they were

harmed by Defendant's deceptive misrepresentations.  Plaintiffs have therefore suffered an injury in fact as a result of Defendant's conduct, as did all Class members who purchased Class Products.  Plaintiffs have retained counsel experienced in complex consumer class action litigation, and Plaintiffs intend to prosecute this action vigorously.  Plaintiffs have no adverse or antagonistic interests to those of the Class.

83.    **Superiority**.  A class action is superior to other methods for the fair and efficient adjudication of this controversy.  The damages or other financial detriment suffered by individual Class members is relatively small compared to the burden and expense that would be entailed by individual litigation of their claims against Defendant.  It would be virtually impossible for a member of the Class, on an individual basis, to obtain effective redress for the wrongs done to him or her.  Further, even if the Class members could afford such individualized litigation, the court system could not.  Individualized litigation would create the danger of inconsistent or contradictory judgments arising from the same set of facts.  Individualized litigation would also increase the delay and expense to all parties and the court system from the issues raised by this action.  By contrast, the class action device provides the benefits of adjudication of these issues in a single proceeding, economies of scale, and comprehensive supervision by a single court, and presents no management difficulties under the circumstances here.

84.    Plaintiffs seek monetary damages on behalf of the entire Class.  Unless a Class is certified, Defendant will be allowed to profit from its deceptive practices, while Plaintiffs and the members of the Class will have suffered damages.

**<u>As and for a First Cause of Action</u>**
*(Violation of New York General Business Law Section 349
As to Plaintiff Ricardo Moncada)*

85.     Plaintiff repeats and re-allege the allegations above as if set forth herein

86.     New York General Business Law Section 349 prohibits "deceptive acts or practices in the conduct of any business, trade, or commerce or in the furnishing of any service in New York."

87.     By labeling, packaging, advertising, marketing, distributing, and/or selling each Class Product to Plaintiff and the other Class members with false and misleading claims that the Class Product was high-quality, safe, defect-free, and fit for its intended use as child restraint system, Defendant engaged in, and continues to engage in, deceptive acts and practices.

88.     In taking these actions, Defendant failed to disclose material information about their products, which omissions were misleading in a material respect to consumers and resulted in the purchase of Defendant's products.

89.     Defendant has deceptively labeled, packaged, advertised, marketed, promoted, distributed, and sold the Class Products to consumers.

90.     Defendant's conduct was consumer oriented.

91.     Defendant engaged in the deceptive acts and/or practices while conducting business, trade, and/or commerce and/or furnishing a service in New York.

92.     Defendant's misrepresentations were misleading in a material respect because the Class Products are not high-quality, safe, defect-free, and fit for their intended use as a child restraint system.

93.     Defendant knew, or should have known, that by making the misrepresentations addressed herein, Plaintiff and other consumers would be misled into purchasing Class Products.

94.    Plaintiff Ricardo Moncada and the Class members have been aggrieved by and have suffered losses as a result of Defendants' violations of Section 349 of the New York General Business Law.  By virtue of the foregoing unfair, unconscionable, and deceptive acts in the conduct of trade or commerce, Plaintiff and the members of the Class have been substantially injured by purchasing and/or overpaying for a product that is not what Defendants represent it to be.

95.    By reason of the foregoing, Defendant's conduct, as alleged herein, constitutes deceptive acts and practices in violation of Section 349 of the New York General Business Law, and Defendants are liable to Plaintiff Ricardo Moncada and the Class for the actual damages that they have suffered as a result of Defendant's actions, the amount of such damages to be determined at trial, plus statutory damages, treble damages, and attorneys' fees and costs.

96.    Defendant's conduct, as alleged herein, in violation of Section 349 of the New York General Business Law was engaged in by Defendant willfully and/or knowingly. Accordingly, Plaintiff Ricardo Moncada and members of the Class are entitled to an award of damages above and beyond their actual damages in accordance with Section 349(h) of the New York General Business Law.

**<u>As and for a Second Cause of Action</u>**
***(Violation of New York General Business Law Section 350***
***as to Plaintiff Ricardo Moncada)***

97.    Plaintiff repeats and re-alleges the allegations above as if set forth herein.

98.    Defendant's labeling, packaging, marketing, and advertising of the Class Products is "misleading in a material respect," as it fails to disclose to consumers material information in Defendant's sole possession and, thus, is "false advertising."

99.     No rational individual would purchase the Class Product at the prices at which they are sold with full knowledge that the Class Product is not high-quality, safe, defect-free, and fit for its intended use as child restraint system.

100.    Defendant's labeling, packaging, marketing, and advertising of the Class Products as being safe, defect-free, and fit for their intended use as child restraint system were consumer oriented.

101.    Defendant's labeling, packaging, advertisements, and marketing of the Class Products as being high-quality, safe, defect-free, and fit for their intended use as child restraint system was misleading in a material respect, which induced Plaintiff Ricardo Moncada and class members to purchase the Product.

102.    By virtue of the foregoing unfair, unconscionable, and deceptive acts in the conduct of trade or commerce in New York, Plaintiff and the members of the Class have been substantially injured by paying for a product that has diminished, lesser, or no value due to its false claims that the Class Products are high-quality, safe, defect-free, and fit for their intended use as child restraint system.

103.    Defendant's conduct, as alleged herein, constitutes false advertising in violation of Section 350 of the New York General Business Law, and Defendant is liable to Plaintiff Ricardo Moncada and the members of the Class for the actual damages that they have suffered as a result of actions, the amount of such damages to be determined at trial, statutory damages, plus treble damages, and attorneys' fees and costs.

### As and for a Third Cause of Action
### (*Breach of Express Warranty as to Plaintiff Ricardo Moncada*)

104.    Plaintiff repeats and re-alleges the allegations above as if set forth herein.

105.    Defendant is a merchant and was at all relevant times involved in the

manufacturing, distributing and/or selling of the Class Products.

106.    At all relevant times, Defendant sold the Class Products with express written warranties.

107.    According to the terms of the warranty, Defendant warrants to the original consumer purchaser that this product will be free from defects in material and workmanship for two (2) years from the date of original purchase (the "Warranty Period"). "If such a defect is discovered during the warranty period, we will, at our discretion, repair or replace your product."

108.    Plaintiff brings this claim individually and on behalf of the other members of the New York Class.

109.    Pursuant to N.Y. U.C.C. Section 2-313(i)(a), "[a]ny affirmation of fact or promise made by the seller to the buyer which relates to the goods and becomes part of the basis of the bargain creates an express warranty that the goods shall conform to the affirmation or promise."

110.    Defendant's written express warranties, as well as advertisements and media representations, formed the basis of the bargain that was reached when Plaintiff and the other Class Members purchased the Class Products.

111.    At the time of selling the Class Products, Defendant did not provide Class Products that conformed to its express warranties.

112.    Defendant breached its express warranty to repair or replace the Product because it has not repaired or replaced the Class Product and/or because it will not repair or replace the Class Product within a reasonable period.

113.    Further, Defendant has refused to provide an adequate warranty repair for the Defect, thus rendering the satisfaction of any notice requirement futile.

114.    Moreover, at the time that Defendant sold the Class Products it knew that the

Class Products contained defective parts and did not conform to the warranty. Plaintiff and other Class Members were thus induced to purchase the Class Products under false pretenses.

115. The written express warranties fail in their essential purpose because the contractual remedy is insufficient to make Plaintiff and the other Class Members whole and because Defendant has refused to provide the promised remedies within a reasonable time. Plaintiff Ricardo Moncada and other class members have suffered additional incidental and consequential damages as a result of Defendant's deceptive and fraudulent representations and their failure to provide a remedy within a reasonable time.

116. Accordingly, recovery by Plaintiff Ricardo Moncada and the other Class members is not limited to the remedy of repair or replacement, and Plaintiff Ricardo Moncada, individually and on behalf of the other Class Members, seeks all remedies as allowed by law.

117. As a direct and proximate result of Defendant's breach of their express warranty, Plaintiff Ricardo Moncada and the other Class Members have been damaged in an amount to be determined at trial.

<u>As and For a Fourth Cause of Action</u>
(*Breach of Implied Warranty as to Plaintiffs Ricardo Moncada and Dukler*)

118. Plaintiffs repeat and re-allege the allegations above as if set forth herein.

119. Defendant is a merchant and was at all relevant times involved in the manufacturing, distributing and/or selling of the Class Products.

120. The Class Products are considered a "good" under the relevant laws.

121. U.C.C. Section 2-314 provides that for goods to be merchantable, they must (a) pass without objection in the trade under the contract description; (b) in the case of fungible goods, are of fair average quality within the description; (c) are fit for the ordinary purpose for which such

goods are used; and (d) run, within the variations permitted by the agreement, of even kind, quality and quantity within each unit and among all units involved.

122.    Defendant breached the implied warranty of merchantability because the Products are not fit for their intended and ordinary use child restraint systems.

123.    Defendant has been provided sufficient notice of its breaches of implied warranties associated with the Class Products.  Upon information and belief, Defendant knew that the Products are not fit for their intended use as child restraint systems and was put on constructive notice of its breach through its own testing and records.

124.    Plaintiffs and each of the other Class Members were injured because the Class Products are not fit for their intended use as child restraint systems.  Defendant thereby breached N.Y. U.C.C. Law § 2-314.

125.    As a direct and proximate cause of Defendant's breach of implied warranty, Plaintiffs and the other Class Members were damaged in the amount they paid for the Class Products, or in an amount to be proven at trial.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs respectfully request that the Court enter judgment against Defendant as follows:

A.    Certifying this action as a class action as soon as practicable, with the Class as defined above, designating Plaintiffs as the named Class representative, and designating the undersigned as Class Counsel.

B.    On Plaintiff's First Cause of Action, awarding against Defendant the damages that Plaintiff and the other members of the Class have suffered as a result of Defendant's actions, the amount of such damages to be determined at trial, plus statutory and treble damages.

C.     On Plaintiff's Second Cause of Action, awarding against Defendant the damages that Plaintiff and the other members of the Class have suffered as a result of Defendant's actions, the amount of such damages to be determined at trial, plus statutory and treble damages.

D.     On Plaintiff's Third Cause of Action, awarding against Defendant the damages that Plaintiff and the other members of the Class have suffered as a result of Defendant's actions, the amount of such damages to be determined at trial.

E.     On Plaintiffs' Fourth Cause of Action, awarding against Defendant the damages that Plaintiffs and the other members of the Class have suffered as a result of Defendant's actions, the amount of such damages to be determined at trial.

F.     On Plaintiffs' First, Second, Third and Fourth Causes of Action, awarding Plaintiffs and the Class interest, costs, and attorneys' fees.

G.     Awarding Plaintiffs and the Class such other and further relief as this Court deems just and proper.

## DEMAND FOR TRIAL BY JURY

Plaintiffs hereby demand a trial by jury on all issues so triable.

Dated:    March 28, 2025
          White Plains, New York

**DENLEA & CARTON LLP**

By:    _____/s/ Catherine H. Friesen_____
       James R. Denlea
       Jeffrey I. Carton
       Catherine H. Friesen
       2 Westchester Park Drive, Suite 410
       White Plains, New York 10604
       Tel.: (914) 331-0100
       Fax: (914) 331-0105
       jdenlea@denleacarton.com
       jcarton@denleacarton.com
       cfriesen@denleacarton.com

       *Attorneys for Plaintiffs*